IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

UNITED STATES OF AMERICA

v.   CRIMINAL ACTION NO. 2:06-00046

WALTER MICHAEL COOPER

**MEMORANDUM OPINION AND ORDER**

Currently pending before the Court is the defendant's Motion to Suppress evidence obtained as a result of the search of the defendant's mother's home on September 24, 2004. The Court, having reviewed the briefs and heard oral argument on the issue, **GRANTS** the motion for the reasons below.

**I.
FACTS**

On the morning of September 24, 2004, Mingo County Deputy Sheriff J.D. Ferris responded to a call that Mr. Cooper, who was reported to be driving a red pick-up truck, had fired shots into a residence in Ragland, West Virginia. Deputy Ferris requested assistance from Delbarton Police Officer Chris Endicott. The officers proceeded to travel to the area of the call. Deputy Ferris testified that he was familiar with Mr. Cooper who he knew had previously been arrested on domestic violence charges. As the officers approached the area of the call, Officer Endicott spotted Mr. Cooper's vehicle at the home of Helen Varney, Mr. Cooper's mother. As the officers approached Ms. Varney's home, Mr. Cooper was outside of the vehicle. The officers directed Mr.

Cooper to stop.  According to Deputy Ferris, Mr. Cooper then began to move quickly towards his mother's home and the officers ran in pursuit.  Mr. Cooper entered the Ms. Varney's home through the rear door.  The officers, after trying the door and finding it locked, kicked the door in and entered the home.  As the officers entered the home, they found Mr. Cooper standing in the kitchen pointing a gun at them.  The officers in turn retreated outside.

Deputy Ferris testified that once outside they tried to get Mr. Cooper to come outside and speak to them; however, Mr. Cooper refused, stating "I'll kill you or you'll kill me."  Mr. Cooper did come to the doorway of the home at one point to speak to the officers.  Deputy Ferris also testified that at some point he became aware that Ms. Varney, Mr. Cooper's sister Lisa, and Mr. Cooper's nephew left the home and were at a neighbor's residence.  Deputy Ferris did not remember how he came to know the whereabouts of Mr. Cooper's mother, sister, and nephew but he did state that he did not believe they were in the home during the stand-off with Mr. Cooper.

Some time later, Mr. Cooper's sister Diane Hannah arrived at the home and went inside to talk with Mr. Cooper.  Shortly after she arrived, Mr. Cooper exited the home with her and the officers placed him under arrest.  Mr. Cooper resisted being restrained.  While the officers were securing Mr. Cooper, they asked Ms. Hannah where the gun was located.  Deputy Ferris testified that he heard someone say it was under the kitchen sink.  Though he believed it was Ms. Hannah that had given the location of the weapon, he could not be certain.  Deputy Ferris then entered the home, went directly to the sink and recovered the weapon.  Deputy Ferris believed the weapon was the same one Mr. Cooper had pointed at them, and Deputy Ferris testified that the weapon was loaded.  The weapon has been identified as a Harrington & Richardson, model 676, .22 caliber revolver, serial number AU049584.  With the evidence of the weapon, a Grand Jury returned an

indictment against Mr. Cooper on March 7, 2006, charging him with possession of a firearm by a prohibited person in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2).

Mr. Cooper disputes the testimony of Deputy Ferris. Mr. Cooper's home was heavily damaged by fire during the night of September 23, 2004, or early morning of September 24, 2004. Mr. Cooper's mother, Helen Varney, testified that her son returned to her home sometime on the morning of September 24, 2004. Mr. Cooper was upset about losing his home and Ms. Varney testified, she told him not to worry and that he could stay with her. Ms. Varney testified that the police arrived and approached the house approximately thirty minutes after Mr. Cooper arrived. According to Ms. Varney, Mr. Cooper became upset and believed the officers were going to kill him. Ms. Varney left the home with her daughter Lisa, and her grandson and went to their neighbors home. After arriving at the neighbor's home, Ms. Varney called her other daughter Diane Hannah, to come to the home.

Ms. Hannah also testified at the hearing. Ms. Hannah stated that she received a phone call from her mother around 8:00 a.m. on the morning of September 24, 2004. Ms. Varney told her that the police were at her home and were after Mr. Cooper. Ms. Hannah testified that she arrived at the home and went inside to try and calm down Mr. Cooper. When Ms. Hannah entered the home, Mr. Cooper was standing on the steps leading into the kitchen. She was able to convince him to exit the home and talk to the officers. Ms. Hannah testified that she never saw a gun; however, she did state that Mr. Cooper had a bottle of Tums wrapped in black tape stuck in the back of the pants. She testified that she took the bottle out of his pants as he exited the home and handed it to Deputy Ferris. Ms. Hannah also testified that she did not tell anyone the location of the gun nor did she give

permission for anyone to enter the home. Ms. Hannah believes that Deputy Ferris was in the home for approximately two to three minutes.

Mr. Cooper argues in his motion to suppress that the defendant had a legitimate expectation of privacy and thus the officer's warrantless search of the home is unreasonable per se. The Government makes four main arguments in response.[1] First, the Government contends that because Mr. Cooper was in the home of a third-party at the time of the arrest, he lacks standing to contest the validity of the search. If the Court finds that Mr. Cooper does have standing, the Government argues that the limited search of the kitchen was a search incident to arrest. Additionally, the Government contends that search falls within the "protective sweep" exception to the warrant requirement. Finally, because the officers had probable cause to obtain a warrant to search the residence, the Government argues that the seizure of the weapon was inevitable. The Court will address each argument in turn.

## II.
## Analysis

**A.    Standing**

The Government initially contends that because Mr. Cooper was arrested in the home of a third party, he lacks standing to challenge the search. In order to have standing to object to a search

---

[1] The Government, in its memorandum in opposition to Mr. Cooper's motion to suppress, also makes a passing contention that the officers perceived that Mr. Cooper's sister had consented to entry into the home and retrieval of the weapon. However, the Government provided no evidence to support such a perception. Deputy Ferris did not provide any testimony that he believed that anyone had consented to a search of the residence. In fact, Deputy Ferris, testified that he was not even certain that it was Ms. Hannah who had told him the location of the weapon. Therefore, because the Government failed to provide any evidence or argument to support implied consent to search, the Court will not address the argument.

on Fourth Amendment grounds, the defendant must have a "reasonable expectation of privacy in the place to be searched." *See Rakas v. Illinois*, 439 U.S. 128, 143 (1978). The relevant inquiry becomes 1) whether the defendant has a subjective expectation of privacy in the place to be searched; and 2) whether that expectation is objectively reasonable. *See United States v. Horowitz*, 806 F.2d 1222, 1225 (4th Cir. 1985).

The Government, at the hearing on this matter, while admitting that Mr. Cooper did have some expectation of privacy as a frequent guest at the home of Ms. Varney, argued that because Ms. Varney fled the home when Mr. Cooper arrived Mr. Cooper lost that expectation of privacy. The Court rejects this argument. The Government provided no evidence as to why Ms. Varney left the residence. Rather, the only evidence before the Court is the testimony of Ms. Varney in which she stated that they fled to a neighbor's because the police arrived, not because of the presence of Mr. Cooper.

Mr. Cooper was a frequent guest at Ms. Varney's home. The evidence shows that Mr. Cooper ate dinner at Ms. Varney's home several times a week, he also occasionally spent the night Ms. Varney's home, and basically came and went from the home as he pleased. Given such a relationship, Mr. Cooper has shown that he had a subjective expectation of privacy and that such a expectation is one which society would find to be reasonable. *See Minnesota v. Olson*, 495 U.S. 91, 96–97 (1990) (finding that the defendant's status as an overnight guest alone was enough to establish a recognizable expectation of privacy); *see also United States v. Carter*, 525 U.S. 83, 99 (1998) ("almost all social guests have a legitimate expectation of privacy"). The Court finds that Mr. Cooper's expectation of privacy in his mother's home "was rooted in 'understandings that are recognized and permitted by society.'" Therefore, Mr. Cooper has standing to challenge the search

of his mother's home pursuant to the Fourth Amendment. *Minnesota v. Olson*, 495 U.S. at 100 (quoting *Rakas v. Illinois*, 439 U.S. 128, 144, n. 12 (1978) (internal citations omitted).

**B.     Search Incident to Arrest**

The Government contends that because the arrest of Mr. Cooper would have occurred in the kitchen had Mr. Cooper not brandished a weapon at the officers, Deputy Ferris' subsequent search of the kitchen and seizure of the gun is allowed under the search incident to a lawful arrest exception to the warrant requirement. The Supreme Court of the United States has authorized officers, in the interest of preserving their safety, to conduct a warrantless search incident to a lawful arrest. *Chimel v. California*, 395 U.S. 702, 763 (1969). The Supreme Court has explained that "[t]he rule allowing contemporaneous searches is justified, for example, by the need to seize weapons and other things which might be used to assault an officer or effect an escape, as well as by the need to prevent the destruction of evidence of the crime - things which might easily happen where the weapon or evidence is on the accused's person or under his immediate control." *Id.* at 764. In *Maryland v. Buie*, 494 U.S. 325 (1990), the Supreme Court refined the test for searches incident to a lawful arrest stating, "as an incident to the arrest the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* at 334; *see also United States v. Turner*, 926 F.2d 883, 887 (4th Cir. 1991) (area searched must be "within the arrestee's immediate control *when he was arrested*") (emphasis in original).

The Court finds that Deputy Ferris, after arresting Mr. Cooper outside of the house, lacked the authority to reenter the house and search, incident to the arrest, for the weapon Mr. Cooper had

brandished. It is uncontested that Mr. Cooper was arrested outside of the residence; therefore, a search incident to the arrest would have permitted the officer to search Mr. Cooper's person and any other space from which Mr. Cooper himself could have launched an immediate attack. Because Mr. Cooper was outside when the arrest occurred, Deputy Ferris had no reason to fear that a weapon located in a cabinet in the kitchen, and not within Mr. Cooper's immediate control, could be used by Mr. Cooper to endanger the officers' safety. Additionally, the weapon was not within the control of Mr. Cooper and thus there was no risk that Mr. Cooper could destroy the evidence. While it is true that if the officers had been able to arrest Mr. Cooper inside the kitchen they may have been justified in searching beneath the kitchen sink for a weapon at the time of the arrest, such a justification is absent where the search was remote from the place of the actual arrest. *See Chimel v. California*, 395 U.S. at 764.

## C.    Protective Sweep

The Government also contends that the search of the kitchen was justified because of the potential danger posed by the weapon at the arrest scene. The Government argues that there had been reports of Mr. Cooper shooting into the homes of others earlier that morning, thus the officers had reason to believe the weapon was loaded. Additionally, Mr. Cooper had brandished the weapon in the officers' presence earlier in their confrontation, informing the officers that the weapon was on the premises.

In support of its arguments, the Government relies on the protective sweep exception to the warrant requirement discussed in *Maryland v. Buie*, 494 U.S. 325 (1990). The Supreme Court in *Buie* "justified a cursory, warrantless search of a residence after a valid arrest of a suspect in those

premises if the arresting officers possess a reasonable belief based on specific and articulable facts that *an individual* in the area poses a danger to those at the arrest scene." *United States v. Steele*, 788 F.Supp. 278, 281 (N.D.W.Va. 1992) (citing *Maryland v. Buie*, 494 U.S. at 334-36) (emphasis added). The Supreme Court reasoned that officers should be able to take steps to "assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Maryland v. Buie*, 494 U.S. at 333.

The Government argues that the officers seized the weapon to protect the safety of the officers and the occupants of the home, especially Mr. Cooper's young nephew. It was the gun itself that the officers believed to pose a risk to the safety of the officers and the residents of the home rather than a belief that another person may be concealed in the residence and pose a safety risk to the officers. Deputy Ferris, however, testified that he had knowledge prior to Mr. Cooper's arrest and prior to his entry into the house that the occupants of the house had fled to a neighbor's home. The Government articulated no facts nor provided any evidence from which it could be inferred that there were any other individuals at the scene or in the home that posed a threat to the safety of the officers or the safety of others. In the absence of such facts, the Court finds that Deputy Ferris lacked the authority to reenter the home to seize the weapon.

**D.     Inevitable Discovery**

Finally, the Government argues that because the officers had probable cause to obtain a search warrant for the weapon, the discovery of it was inevitable. The inevitable discovery exception to the exclusionary rule applies "[i]f the prosecution can establish by a preponderance of

the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). To carry its burden in this context, the Government must prove not only that the officers had probable cause to search and that a search would have uncovered the weapon, but also that the officers would have obtained a search warrant. *United States v. Allen*, 159 F.3d 832, 841-42 (4th Cir. 1998). In *Allen* the Fourth Circuit relied, in part, of the decision of the Ninth Circuit in *United States v. Mejia*, 69 F.3d 309 (1995) in which the Ninth Circuit stated:

> We reject the contention that [the inevitable discovery] doctrine applies where the police had probable cause to conduct a search but simply failed to obtain a warrant...If evidence were admitted notwithstanding the officers' unexcused failure to obtain a warrant, simply because probable cause existed, then there would never be any reaons for officers to seek a warrant.

*Id.* at 842 (quoting *United States v. Meija*, 69 F.3d at 320). The Government has failed to provide any evidence that the officers took any steps to obtain a warrant or would have taken such steps absent the illegal search. In fact, "nothing indicates that the officers *ever* contemplated obtaining a search warrant." *Id.* at 842-43 (emphasis in original). The testimony of Deputy Ferris at the hearing showed that while other officers had arrived at the scene prior to or contemporaneously with Mr. Cooper's arrest, no steps had been taken to secure a warrant. The Government, at the hearing, called only Deputy Ferris to testify and he offered no evidence that the officers took any steps or even contemplated seeking a warrant. Therefore, absent concrete evidence that the officers would have secured a warrant, the inevitable discovery doctrine does not apply to the illegal search in this case.

## III.
## Conclusion

In conclusion, the Court finds that the Government has not satisfied its burden of demonstrating that exigent circumstances existed so as to justify the officer's warrantless entry into Ms. Varney's house. Accordingly, the Court **GRANTS** the defendant's motion to suppress evidence and **ORDERS** that the gun obtained following the warrantless entry into the house be suppressed.

The Court **DIRECTS** the Clerk to send a copy of this Written Opinion and Order to counsel, the defendant and the U.S. Attorney's Office.

ENTER: May 16, 2006

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE